# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-10409

United States Court of Appeals
Fifth Circuit

**FILED**

April 8, 2016

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

> Plaintiff - Appellee Cross-Appellant

v.

JEFFREY DAVID GUNSELMAN, Individually, doing business as Absolute Fuels, L.L.C.,

> Defendant - Appellant Cross-Appellee

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 5:12-CR-78

Before HIGGINBOTHAM, SOUTHWICK, and HIGGINSON, Circuit Judges.

PER CURIAM:*

Jeffrey Gunselman appeals his conviction and sentence for wire fraud, money laundering, and violations of the Clean Air Act, alleging several interrelated constitutional violations below. He also claims that his guilty plea was not knowing and voluntary, that the court erred in calculating the loss amount underlying his sentence and restitution obligation, and that the court

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-10409

erroneously enhanced his sentence. The government cross-appeals to correct an error in the written judgment. We VACATE the offset condition in the written judgment below, and AFFIRM in all other respects.

I

Federal law requires energy companies producing or importing fossil fuels to introduce a certain amount of renewable fuels, such as corn-based ethanol and other biodiesels, into the fuel supply each year. They can do this by purchasing renewable fuel credits from companies that produced renewable fuels. These credits are called Renewable Identification Numbers, or RINs. Gunselman represented to the EPA and to fuel companies seeking to purchase RINs that he manufactured renewable fuels when, in fact, he did not. Between January 2010 and October 2011, Gunselman produced no commercially usable renewable fuel, but he sold over 46 million RINs for more than $40 million. He admitted he "falsely represented that he was in the business of producing bio-diesel fuel, although he did not produce any bio-diesel fuel that met the bio-diesel fuel standard tests and that was accepted by a purchaser," and that "his business operation consisted solely of falsely generating RINs and marketing them to brokers and oil companies."

Gunselman was indicted on and ultimately pled guilty to seventy-nine counts, including fifty-one counts of wire fraud, twenty-four counts of money laundering, and four counts of making a false statement under the Clean Air Act. His plea included the following provision:

> Except as otherwise provided, Gunselman hereby expressly waives the right to appeal his conviction and/or sentence on any ground, including any appeal right conferred by 18 U.S.C. § 3742, and Gunselman further agrees not to contest his conviction and/or sentence in any post-conviction proceeding, including, but not limited to, a proceeding under 18 U.S.C. §§ 2241 and 2255. Gunselman, however, reserves the right to appeal the following:

No. 13-10409

(a) any punishment imposed in excess of the statutory maximum, and (b) any claim based on ineffective assistance of counsel.

Gunselman also stipulated that his misconduct caused $41,762,236.87 in losses, and agreed that

[n]otwithstanding this stipulation regarding the loss amount, Gunselman fully understands that he will not be allowed to withdraw his plea of guilty if, after a presentence report has been prepared, the amount of loss is found to be higher than the above-stated amount. Gunselman understands that the above-referenced stipulation is not binding upon the Court or upon the probation office, and he will not be allowed to withdraw his guilty plea should the stipulation not be followed by the Court.

After an uneventful plea hearing, elements of which are described in greater detail below, the judge accepted Gunselman's plea and ordered a presentence investigation. The resulting presentence report ("PSR") calculated that Gunselman had in fact caused $58,301,877.55 in losses, most of which were incurred when his victims, fuel producers or importers who purchased fraudulent RINs from Gunselman, were forced to buy valid RINs to replace them. It determined that Gunselman's offense level was 34 and his criminal history category was I, yielding a guideline sentence range of 151 to 188 months.[1] Finally, it calculated that Gunselman owed over $53 million in restitution to his victims pursuant to 18 U.S.C. § 3663A; a subsequent addendum adjusted this sum upward to $54,973,137.50.

Gunselman objected to the PSR's loss calculation, sentence calculation, and restitution analysis. The judge overruled the objections, sentenced him to 188 months in prison, and ordered him to pay $54,973,137.50 in restitution pursuant to the Mandatory Victims Restitution Act (MVRA).[2]

---

[1] The PSR indicated that if the loss amount were found to match the one stipulated in the plea agreement, Gunselman's guideline sentence range would be 121 to 151 months.

[2] Specifically, following the PSR's analysis, the judge sentenced Gunselman to 188 months for the wire fraud counts, 120 months for the money laundering counts, and 24

3

No. 13-10409

Gunselman now appeals his plea and sentence. In addition, the government appeals the district judge's order that Gunselman's restitution "be offset by funds already seized and in the hands of the Government, as well as any additional funds garnered by the Government from loan payments, sale of items, and any other cash flows." The district judge included this provision in his written judgment, apparently mistakenly, and then tried to rescind it on the government's motion pursuant to Rule 35(a), but his attempt to amend was untimely.[3]

II

Gunselman's fourteen purported points of error can be condensed into a handful of distinct claims. We address each in turn, beginning with his challenge to the validity of his plea.[4] A guilty plea must be knowing and voluntary to be enforced.[5] To that end, Rule 11 of the Federal Rules of Criminal Procedure sets forth procedures for the district judge to follow in reviewing a plea with a defendant.[6] Gunselman argues that his plea hearing was inadequate, that he did not voluntarily and knowingly plead guilty, and that the plea and the appellate waiver it contained cannot be enforced. We review these questions *de novo*.[7]

Gunselman's plea agreement listed each of the rights he was forfeiting by entering into the agreement and the maximum penalties for each count. By signing the agreement, Gunselman represented that the plea was "freely and

---

months for the false statement counts, each to run concurrently, for a total sentence of 188 months.

[3] See discussion *infra* notes 40-43 and accompanying text.

[4] Gunselman also raised a host of new issues in his reply brief (which doubles as a response to the government's cross-appeal). They are waived. *See Casas v. American Airlines, Inc.*, 304 F.3d 517, 526 (5th Cir. 2002); *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994).

[5] *See Boykin v. Alabama*, 395 U.S. 238, 244 (1969).

[6] *See* FED. R. CRIM. P. 11(b); *United States v. Vonn*, 535 U.S. 55, 62 (2002).

[7] *United States v. Baymon*, 312 F.3d 725, 727 (5th Cir. 2002); *United States v. Amaya*, 111 F.3d 386, 388 (5th Cir. 1997).

No. 13-10409

voluntarily made and [was] not the result of force or threats, or of promises apart from those set forth in this Plea Agreement." He admitted that he had reviewed all legal and factual aspects of his case with his attorney and was satisfied with his legal representation, and that his attorney had satisfactorily explained to him each paragraph of the plea agreement, all of his rights affected by the plea agreement, and the alternatives available to him other than pleading guilty. He acknowledged that it was "in his best interest to enter into this plea agreement and all its terms."

At the plea hearing, the Government read the entire indictment in open court, and Gunselman acknowledged that he understood the allegations in the indictment. He also confirmed that he had read over and signed the plea agreement and understood and agreed to its terms and conditions. The court specifically asked whether he understood that he was waiving the right to appeal except for very limited reasons, and Gunselman said that he did. He acknowledged that he was forfeiting the right to a jury trial, that he was pleading guilty because he was guilty, and that his plea was not "the result of any force, threats, or promises on behalf of the government."

The court reviewed the statutory maximum penalties for each offense, and it explained that the guidelines were advisory only and that the court could impose a sentence up to the statutory maximum. Gunselman stated that he understood. The court asked if Gunselman had read the factual resume and whether it accurately reflected the facts on which his guilty plea was based, and Gunselman responded in the affirmative. The court then inquired, "After reviewing your rights, the nature of the charges presented, and the potential penalties, do you still wish to plead guilty to this indictment?" Gunselman replied in the affirmative. The district court found that Gunselman was "fully competent and capable of entering an informed plea and that his plea of guilty

5

No. 13-10409

is a knowing and voluntary plea supported by an independent basis in fact containing each of the essential elements of the offenses charged."

These facts show that Gunselman's plea was knowing and voluntary and that the district judge fulfilled Rule 11 in reviewing it with him. We recently described the knowing-and-voluntary standard as follows:

> To enter a knowing and voluntary guilty plea, the defendant must have a "full understanding of what the plea connotes and of its consequence." The defendant must have notice of the nature of the charges against her, she must understand the consequences of her plea, and must understand the nature of the constitutional protections she is waiving. For a guilty plea to be voluntary, it must "not be the product of 'actual or threatened physical harm, or ... mental coercion overbearing the will of the defendant' or of state-induced emotions so intense that the defendant was rendered unable to weigh rationally his options with the help of counsel."[8]

Gunselman does not claim coercion, and the record shows that he received the requisite notice and understood the relevant consequences and protections to be waived. His plea, and the appellate waiver he executed as part of it, are therefore enforceable absent some other invalidating defect.[9]

## III

Gunselman further alleges that his indictment was duplicitous and that the duplicity undermines his sentence and conviction in several ways.[10]

---

[8] *United States v. Urias-Marrufo*, 744 F.3d 361, 366 (5th Cir. 2014) (quoting *Boykin*, 395 U.S. at 244, and *Matthew v. Johnson*, 201 F.3d 353, 365 (5th Cir. 2000)).

[9] In an attachment to his appellate brief, Gunselman claims that he was "on mind-altering drugs" when he pled guilty. Nothing in the record supports this claim, and it is waived in any case because it was not included in the brief. *See United States v. Thames*, 214 F.3d 608, 611 n.3 (5th Cir. 2000). Gunselman also argues that the district judge should have offered a more elaborate plea hearing because his case had been designated "complex" for purposes of the Speedy Trial Act. However, he cites no authority for the notion that such a designation triggers additional obligations under Rule 11, and we have found none. Also, Gunselman's case was declared "complex" because of the extent and quality of the relevant evidence, not because the charges he faced were especially complicated.

[10] A duplicitous indictment "improperly joins two or more offenses in . . . single count[s]." *United States v. Lampazianie*, 251 F.3d 519, 525 (5th Cir. 2001).

Specifically, he claims that certain wire fraud counts in the indictment were duplicitous and therefore invalid; that because of this, the money laundering counts in the indictment, which derived from the wire fraud counts, were also invalid; that the judgment and plea agreement, which relied on the indictment, were also invalid; that the duplicity resulted in a higher sentence and restitution obligation than were warranted; that his counsel was ineffective for failing to address the issue; and that his plea hearing was inadequate (and the resulting plea agreement unenforceable), because a judge conducting an adequate hearing "would have noticed the duplicitous charges."

The government concedes that four counts were duplicitous. However, Gunselman waived this issue by pleading guilty. A "voluntary and unconditional plea waive[s the] right to appeal any nonjurisdictional defects in the prior proceedings," and duplicity is a nonjurisdictional defect.[11] Gunselman did not condition his plea on being able to challenge the duplicitous charges.[12] Therefore, his duplicity claims are waived except insofar as they affect the validity of the plea itself.

A plea is invalid if it was not knowing and voluntary, but as discussed above, Gunselman's plea was knowing and voluntary. The fact that some of the charges were duplicitous, and that this issue was not aired at the plea hearing, does not alter this conclusion, since the record shows that Gunselman still understood the nature of the charges. Neither Rule 11 nor our case law required anything more.[13]

---

[11] *Lampazianie*, 251 F.3d at 525-56 & n.19.

[12] *See* FED. R. CRIM. P. 11(a)(2) ("[A] defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right to have an appellate court review an adverse determination of a specified pretrial motion.").

[13] *See id.* 11(b)(1)(G); *United States v. Bachynsky*, 924 F.2d 561, 565 (5th Cir. 1991) ("We agree with Bachynsky that the charges to which he pled guilty were complex and that the district court did not explain every facet of each charge. But the purpose of Rule 11 is not to have every detail of the charge read aloud to the defendant; rather, its purpose is to ensure

No. 13-10409

A plea may also be invalid if it was tainted by ineffective assistance of counsel in such a way that the plea cannot be considered truly voluntary.[14] Gunselman alleges that his counsel was ineffective for failing to notice and object to the duplicitous charges, and for advising him to enter a plea agreement based on duplicitous charges. This claim is foreclosed: "Sixth Amendment claims of ineffective assistance of counsel should not be litigated on direct appeal, unless they were previously presented to the trial court."[15] And even if we were to consider this claim on the merits, it would fail, as Gunselman could not have suffered prejudice from his attorney's failure to spot the duplicity. To prevail on an ineffective assistance of counsel claim relating to a guilty plea, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."[16] Gunselman appears to think that the affected charges would have been dismissed upon objection, such that he would have been entitled to a more lenient plea deal or a lower sentence and would

---

that the defendant adequately understands the charge to which he is pleading guilty, and to have that understanding documented on the record."). We have recognized that there is no "simple or mechanical rule" to guide the district judge in deciding how extensively to describe charges to a defendant in order to fulfill Rule 11(b)(1)(G), and that the inquiry is highly context-specific and ultimately "commit[ted] . . . to the good judgment of the court." *United States v. Dayton*, 604 F.2d 931, 937-38 (5th Cir. 1979) (en banc). The contextual factors here, including the fact that Gunselman was represented by counsel and the fact that he is intelligent enough to have produced a lengthy and fairly sophisticated pro se brief on appeal, strongly suggest that the judge's description was adequate.

[14] *See United States v. Henderson*, 72 F.3d 463, 465 (5th Cir. 1995); *Murray v. Collins*, 981 F.2d 1255 (5th Cir. 1992) ("A valid guilty plea waives all nonjurisdictional defects including an ineffective assistance of counsel claim, unless the ineffective assistance claim goes to the voluntariness of the plea."). Gunselman reserved the right to appeal his conviction on the basis of ineffective assistance of counsel.

[15] *United States v. Isgar*, 739 F.3d 829, 841 (5th Cir.), *cert. denied sub nom. Aldridge v. United States*, 135 S. Ct. 123 (2014) (quoting *United States v. Aguilar*, 503 F.3d 431, 436 (5th Cir. 2007) (per curiam)). Although this rule is lifted in "rare cases in which the record allows a reviewing court to fairly evaluate the merits of the claim," *id.* (quoting *Aguilar*, 503 F.3d at 436), the record before us suggests little about Gunselman's counsel's approach to the issues relevant here.

[16] *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

therefore have had reason to reject the plea offered. But a duplicitous charge need not be dismissed.[17] Indeed, the government could simply have divided up the duplicitous counts and reindicted, thus subjecting Gunselman to *more* charges. Moreover, even if the duplicitous charges had been dismissed, this would not have affected the length of his sentence or his restitution obligation, because under the sentencing guidelines, the loss amount from which those figures were to be calculated was to be based on the entire course of conduct underlying the charges – not only on the conduct alleged in the charges themselves.[18]

IV

Gunselman also alleges prosecutorial misconduct. He claims the prosecution lied in alleging in the indictment that he sold RINs produced at his Anton, Texas plant to Marathon Petroleum, when government documents actually indicated that he had purchased them from another biodiesel company. He also claims that the prosecution intercepted a payment from Tesoro Refining to Gunselman for fake RINs, then charged him anyway for receiving the money.[19]

Again, Gunselman has waived these claims, because they do not implicate the jurisdiction of the trial court; as noted above, Gunselman's "voluntary and unconditional plea waived his right to appeal any

---

[17] *See Lampazianie*, 251 F.3d at 526.

[18] *See* U.S. Sentencing Guidelines Manual § 1B1.3(a), (a)(2) ("[S]pecific offense characteristics . . . with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts" "shall be determined on the basis of" "all acts and omissions . . . *that were part of the same course of conduct or common scheme or plan as the offense of conviction*.") (emphasis added), § 3D1.2(d) (counts for offenses covered by § 2B1.1, which addresses crimes of fraud and deceit, are to be grouped).

[19] Gunselman further claims that his counsel was ineffective for failing to address the alleged prosecutorial misconduct. This claim is foreclosed because Gunselman did not present it to the trial court. *See supra* note 15 and accompanying text.

nonjurisdictional defects in the prior proceedings."[20] Both claims also fail on the merits. As part of his plea, Gunselman admitted that the allegations in the indictment were true, including the allegation that the Marathon RINs in question were produced in Anton.[21] In addition, the Tesoro wire fraud charge is unaffected by the government's purportedly having intercepted the relevant payment, because "wire fraud is complete when a defendant makes a communication to advance what he knows to be a fraudulent scheme," not when he receives money.[22]

V

In other points of purported error, Gunselman objects, as he did below, to the loss amount on which his sentence and restitution obligation are based.[23] He notes that the roughly $54 million loss for which he was ultimately held responsible differs from the roughly $41 million loss he stipulated to in the plea agreement, and argues that the difference indicates that his restitution obligation and sentence are excessive.

In the plea agreement, Gunselman stated that he "fully underst[ood] that he [would] not be allowed to withdraw his plea of guilty if, after a presentence report has been prepared, the amount of loss [were] found to be higher than the [stipulated] amount" and that he "underst[ood] that the . . . stipulation [was] not binding upon the court or upon the probation office, and he [would] not be allowed to withdraw his guilty plea [if] the stipulation [were] not be followed by the Court." The fact that he stipulated to a lower loss amount

---

[20] *Lampazianie*, 251 F.3d at 526.

[21] Gunselman also affirmed, at the plea hearing, that the factual resume in the plea agreement was accurate. *See United States v. Cervantes*, 132 F.3d 1106, 1110 (5th Cir. 1998) ("Solemn declarations in open court carry a strong presumption of verity.") (quoting *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977)).

[22] *United States v. Neal*, 294 F. App'x 96, 101 (5th Cir. 2008).

[23] Strictly speaking, Gunselman objected to the loss amount calculation only insofar as it affected restitution; however, the arguments as to the sentence are the same.

is therefore immaterial in isolation. Gunselman must show that the use of the higher loss amount caused a "punishment in excess of the statutory maximum." He claims that it did, for two reasons.

First, Gunselman claims that the loss amount reflects losses incurred before the transactions listed in the indictment. Specifically, he argues that the loss amount includes losses arising from transactions with BioUrja Trading that occurred before September 2010, the starting point for the charges outlined in the indictment.[24] He objected to the initial version of the PSR on the same ground. In response, an addendum to the PSR noted that "the pre-September 2010 transactions were not considered in the restitution request for BioUrja Trading, LLC., though they were considered as loss." Gunselman does not allege that the evidence belies this assertion, so his argument fails insofar as restitution is at issue. Moreover, it was permissible to consider the transactions in question in calculating his sentence, because as discussed above, the sentence was to be calculated based on "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction."[25]

Second, Gunselman objects to the method the court used to appraise his victims' losses. Following the PSR, the court determined that each victim's loss was the greater of the amount each paid for the fraudulent RINs and the amount each paid to replace the fraudulent RINs with legitimate ones. Gunselman objects to the use of replacement costs in any capacity and to the

---

[24] *See United States v. Sharma*, 703 F.3d 318, 323 (5th Cir. 2012) (under the MVRA, "[a]n award of restitution cannot compensate a victim for losses caused by conduct not charged in the indictment or specified in a guilty plea, or for losses caused by conduct that falls outside the temporal scope of the acts of conviction."). Under *Sharma*, Gunselman's argument alleges that his restitution obligation exceeds the statutory maximum, so his appellate waiver does not foreclose the argument. *See id.* at 321 n.1.

[25] *See supra* note 18.

use of the higher of the two figures in determining each victim's awards.[26] We construe these as arguments that the restitution award exceeds the statutory maximum, rendering Gunselman's appellate waiver inapplicable, at least as far as restitution is concerned.[27] However, Gunselman's argument *is* waived insofar as it implicates the length of his sentence.[28]

"A restitution award is reviewed for an abuse of discretion[;] '[a] trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence.'"[29] We have held that the MVRA does not allow restitution for consequential damages, such as amounts expended as legal fees or in order to recover stolen property.[30] Gunselman claims that replacement costs are consequential damages akin to penalties, since the victims had to buy legitimate RINs in order to comply with the law.[31] As other circuits have recognized, the MVRA "contemplate[s] the exercise of discretion by sentencing courts in determining the measure of value appropriate to restitution calculation in a given case."[32] "'[V]alue' as used in the MVRA [is] a flexible concept to be calculated by a district court by the

---

[26] Gunselman also claims that the restitution award included victims' "other costs," such as legal fees. However, the calculation in the PSR appears to derive solely from amounts paid to Gunselman or expended in replacing the fraudulent RINs.

[27] Recall that "Gunselman . . . reserve[d] the right to appeal . . . any punishment imposed in excess of the statutory maximum" in his plea agreement. *See United States v. Jones*, 616 F. App'x 726, 727-29 (5th Cir. 2015) (unpublished) (where appellant executed an appellate waiver reserving the right to appeal a sentence exceeding the statutory maximum, addressing his valuation-method challenge on the merits).

[28] The exception in Gunselman's appellate waiver for a punishment in excess of the statutory maximum does not apply in this context, since his sentence (as distinct from his restitution obligation) was lower than the statutory maximum.

[29] *United States v. Crawley*, 533 F.3d 349, 358 (5th Cir. 2008) (citation omitted) (quoting *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008).

[30] *United States v. Onyiego*, 286 F.3d 249, 256 (5th Cir. 2002).

[31] Gunselman's argument is not entirely accurate. It appears that at least one of Gunselman's victims had to buy legitimate RINs after the fraud was uncovered because it had already sold the RINs to third parties, not because it needed to come into compliance itself.

[32] *United States v. Boccagna*, 450 F.3d 107, 114 (2d Cir. 2006).

measure that best serves Congress's statutory purpose."[33] That purpose is "essentially compensatory: to restore a victim . . . to the position he occupied before sustaining injury."[34] Accordingly, other circuits have sanctioned the use of replacement cost when that measure appears best suited to make victims whole.[35]

In implementing the MVRA's statutory purpose in this case, we find the federal sentencing guidelines instructive.[36] They advise the district court to appraise victims' injuries according to "the fair market value of the property unlawfully taken" – unless that value "inadequately measures the harm."[37] In this case, Gunselman injured his victims by taking their money under false pretenses. Naturally, the default measure of their injury, i.e., the "fair market value of the property" he unlawfully took, is equal to those sums. However, some of Gunselman's victims apparently had to scramble, after his fraud was uncovered, to obtain replacement RINs in order to meet obligations to customers and regulators.[38] In the process, they were forced to pay more for the valid RINs than they had paid Gunselman for the fraudulent ones. To restore to these victims only the amounts they paid Gunselman would

---

[33] *Id.* at 114-15.

[34] *Id.* at 115.

[35] *See, e.g.*, *United States v. Wilfong*, 551 F.3d 1182, 1184 n.2 (10th Cir. 2008); *Boccagna*, 450 F.3d at 116; *United States v. Rhodes*, 330 F.3d 949, 953 (7th Cir. 2003); *United States v. Simmonds*, 235 F.3d 826, 832 (3d Cir. 2000); *United States v. Shugart*, 176 F.3d 1373, 1375 (11th Cir. 1999). Notably, the federal sentencing guidelines expressly allow courts to use replacement cost in assessing victims' losses in "product substitution cases." U.S. SENTENCING GUIDELINES MANUAL § 2B1.1 cmt. n.3(A)(v)(I) (U.S. Sentencing Comm'n 2015).

[36] Although the MVRA itself, and not the guidelines, governs our restitution analysis, *see, e.g.*, *United States v. Ferdman*, 779 F.3d 1129, 1138 (10th Cir. 2015), other courts have found the guidelines' commentary instructive in calculating MVRA restitution. *See, e.g.*, *Rhodes*, 330 F.3d at 953-54.

[37] *Accord Boccagna*, 450 F.3d at 115 (fair market value is the default measure of MVRA restitution).

[38] *Cf. Rhodes*, 330 F.3d at 953 (upholding a restitution award equivalent to "the amount of money [the victim] had to dole out in order to make its customers whole as a result of Rhodes' fraud").

No. 13-10409

disregard the difference between the two sums – an additional amount that came out of the victims' pockets as a direct and entirely foreseeable result of Gunselman's fraud. Given this, and mindful of the discretion afforded the court below, we find no error in the district court's use of replacement cost in calculating Gunselman's restitution obligation to certain victims.[39]

VI

Finally, Gunselman claims that the district court erroneously applied an enhancement for sophisticated means. He waived this argument; none of the exceptions in his appellate waiver apply. Moreover, the record contains ample evidence to support the factual finding that Gunselman employed sophisticated means, for example, by creating a corporation, purchasing multiple facilities, disseminating false information to other businesses, and hiring and manipulating employees to perpetuate the scheme. His claim fails.

VII

The government asks us to modify the judgment below by eliminating its restitution offset condition.[40] This condition was not part of the oral sentence, issued on March 29, but was included in Gunselman's written sentence, issued on April 12. The government filed a timely Rule 35(a) motion to eliminate the condition.[41] The district court assented and ordered the modification on April

---

[39] *See United States v. Simpson*, 741 F.3d 539, 556-57 (5th Cir. 2014); *United States v. Crawley*, 533 F.3d 349, 358 (5th Cir. 2008); *see also United States v. Spencer*, 700 F.3d 317, 323 (8th Cir. 2012) (discussing the MVRA's causation requirement).

[40] The judgment ordered that Gunselman's restitution "be offset by funds already seized and in the hands of the Government, as well as any additional funds garnered by the Government from loan payments, sale of items, and any other cash flows."

[41] *See* FED. R. CRIM. P. 35(a) ("Within 14 days after sentencing, the court may correct a sentence that resulted from arithmetical, technical, or other clear error."), (c) ("As used in this rule, 'sentencing' means the oral announcement of the sentence.").

No. 13-10409

30 – more than fourteen days after sentencing.[42] The modification was therefore ineffective for lack of jurisdiction.[43]

We may "affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances."[44] We see no reason not to make the requested modification.[45] The oral sentence is legally sound.[46] In addition, when a written sentence conflicts with an oral sentence, the latter controls.[47] Therefore, we do not disturb the status quo in reforming the written sentence to match the oral sentence in this case.[48]

## VIII

We VACATE the portion of the written judgment below ordering that Gunselman's restitution "be offset by funds already seized and in the hands of

---

[42] The sentence was orally pronounced March 29, the motion to correct judgment was filed on April 12, and the modification was ordered on April 30.

[43] *See, e.g.*, *United States v. Gonzalez*, 509 F. App'x 356, 357 (5th Cir. 2013) (unpublished).

[44] 28 U.S.C. § 2106; *see United States v. Hermoso*, 484 F. App'x 970, 973 (5th Cir. 2012) (our choice to either reform a judgment or remand to the district court for the same purpose is discretionary).

[45] Gunselman claims that the government waived the issue by failing to raise it in the plea agreement or at sentencing, but the government persuasively argues that it had no reason to raise the issue until the offset provision appeared in the written sentence, since the inclusion of the offset provision was the deviation from the status quo. Gunselman also claims that the government violated the plea agreement by moving for modification; however, the plea agreement did not address the offset issue, whether implicitly or explicitly.

[46] *See United States v. Taylor*, 582 F.3d 558, 568 (5th Cir. 2009) (a defendant is not entitled to have the district court "offset[ a] restitution obligation by the amount [the defendant] was required to forfeit," at least where "there is no evidence that the victims of [the] criminal conduct have received any of the forfeited funds or other restitution payments"). As of the PSR, no forfeited funds had been disbursed to victims.

[47] *United States v. Martinez*, 250 F.3d 941, 942 (5th Cir. 2001).

[48] Gunselman claims that his counsel was ineffective because he "specifically [and erroneously] counseled [Gunselman] that collected monies would be applied toward restitution." This claim is foreclosed because Gunselman did not present it to the trial court.

No. 13-10409

the Government, as well as any additional funds garnered by the Government from loan payments, sale of items, and any other cash flows." In all other respects, we AFFIRM the judgment of the district court.